## NASHVILLE RAILWAY & LIGHT COMPANY, v. W. H. HARRISON et al., TRUSTEES OF WOODBINE M. E. CHURCH SOUTH

and

## NASHVILLE RAILWAY & LIGHT COMPANY v. W. M. LANTRIP.

Middle Section.    March 5, 1927.

Petition for Certiorari denied by Supreme Court, July 15, 1927.

1. Negligence. Negligence may be proved by circumstantial evidence.
    It is well settled law in Tennessee that negligence may be proved by circumstantial evidence.

2. Evidence. Expert testimony. The length of time for an over heated wire to set fire to wood is not a subject for expert testimony.
    In an action to recover for the loss of a house alleged to have been set on fire by an over heated electric light wire where the defendant offered

an expert to testify as to the length of time required by red hot wire to set fire to wood held that the court properly held that such testimony did not fall within the category of expert testimony; that it was a matter of common knowledge and a matter of conclusion for the jury.

3. **Evidence. Expert testimony. An expert can not testify as to facts which nonexpert witnesses have the same opportunity to know.**

Expert witness may not be allowed to testify as to matters which are accorded to the common every day observation of ordinary persons.

4. **Trial. Verdict. A verdict can not be based upon conjecture.**

Where the evidence shows two or more causes which might have caused the injury complained of, and the verdict is the result of the jury's conjecture as to which caused the injury, held that such a verdict can not be allowed to stand.

5. **Trial. Verdict. Conjecture only when there is evidence of more than one cause.**

The rule that the jury cannot determine by guess or conjecture between two equally probable causes of the injury, for only one of which the defendant is responsible, has no application where there is no substantial evidence of a sufficient cause, or causes, for the injury, aside from the negligence charged.

6. **Evidence. Where evidence indicates only one cause of the injury a verdict based thereon is valid.**

In an action to recover for the loss of a house from fire where the evidence presented indicated only one cause of the fire, held that the case must be determined according to the rule that negligence may be shown by circumstantial evidence and the verdict was not the result of guess work on the part of the jury.

7. **Evidence. Circumstantial evidence necessary to establish negligence must be such as will satisfy reasonable minds.**

Circumstantial evidence to establish negligence, must be such that negligence can reasonably be inferred from the facts shown, or such as satisfy reasonable minds thereof; that there must be more than a mere probability that the defendant was negligent; but that the plaintiff is not bound to exclude the possibility that the accident might have happened in some other way than alleged.

8. **Evidence. Circumstantial evidence makes question for the jury, when.**

Where after a fair consideration of the circumstantial evidence, the more reasonable probability is in favor of negligence the case is for the jury.

9. **Evidence. Circumstantial evidence held sufficient to support verdict.**

In an action to recover for the loss of a house caused by fire, where the evidence showed that defendant's servant was making repairs on the light wires of the house and had used a penny in the fuse socket which would cause sufficient current to pass through the wiring in the house to heat the wires and that immediately thereafter the fire was discovered in a closet, and the evidence further showed that there had been no fires in the house and no other reason could be given for the starting of the fire, held that there was evidence from which the jury might reasonably infer that the fire was caused from an overheated light wire.

10. **Trial. Instructions. Every litigant has a right to have his theory of the case submitted to the jury.**

It is the right of every litigant upon reasonable and appropriate requests, to have his theory of every material issue of fact submitted to the jury on a correct charge of applicatory law.

**11. Trial. Instructions. Instruction that limits recovery to one specific act of negligence is bad.**

An instruction which limited plaintiff's recovery upon one specific act of negligence when the evidence showed other acts of negligence is erroneous and held properly refused.

**12. Trial. Instructions. Instructions requested must be strictly correct.,**

A trial court can not be put in error for refusing to give an instruction unless the instruction requested is strictly correct.

**13. Damages. Substantial damages may be allowed for the destruction of property which has no market value.**

Where certain paintings and manuscripts of sermons were destroyed by fire, it being admitted that they had no market value, but were especially valuable to the owner because of the labor and materials therein, held that the plaintiff was entitled to recover substantial damages for them.

**14. Appeal and error. On appeal the action of a trial judge in requiring a remittitur is entitled to great weight.**

In considering the reasonableness of a verdict on appeal the appellate court will give great weight to the action of the trial court in directing a remittitur.

. Appeal in Error from Circuit Court of Davidson County; Hon. A. G. Rutherford, Judge.

Affirmed.

J. M. Anderson and R. F. Jackson, of Nashville, for plaintiff in error.

Roberts & Roberts and McGugin, Evans & Cate, of Nashville, for defendants in error.

DeWITT, J. The Nashville Railway & Light Company, a public service corporation, has appealed in the nature of a writ of error from a judgment rendered against it in each of these two cases, which were tried together before the circuit judge and jury. In the suit of W. M. Lantrip there was a verdict for $2000, but upon the motion for new trial the circuit judge suggested a remittitur of $500, which was accepted under protest, and judgment was rendered in his favor for $1500. W. M. Lantrip by writ of error and assignments of error has preserved his exceptions to the suggestion of remittitur. In the suit of W. H. Harrison et al., Trustees, there was a verdict and judgment for $4000.

These two actions were based upon the same facts as constituting causes of action in favor of these plaintiffs. They were suits for damages for destruction of certain real and personal property by fire, alleged to be due to the negligence of one Welch, an employee of the Railway & Light Company, while engaged in the performance of his duty as a "trouble man," upon being called to remedy defects in the lighting system of the house occupied by said W. M. Lantrip, the pastor of the Woodbine M. E. Church south, and held by W. H. Harrison, et al. as trustees, as a parsonage for said pastor and con-

gregation. The suit of the trustees was brought for the value of the house, and the suit brought by Reverend W. M. Lantrip, was brought for the value of his household goods and other personal property, destroyed by the fire. The fire occurred about seven o'clock in the evening of March 21, 1925.

The house was a seven room, two-story frame residence, about three and one-half years old. In the declaration as amended, it was charged that the plaintiff, W. M. Lantrip was a customer of the Railway & Light Company, that among its duties to its customers, was the employment and use of proper and safe electrical appliances, and the making of necessary changes and repairs on their electric light apparatus, on account of the dangerous quality of the electric current used; that on March 21, 1925, some trouble or defect appeared in the wiring or apparatus of said residence; that defendant sent its agent or employee to repair the same; that he carelessly, negligently and in violation of defendant's duty, contrary to good usage, and the exercise of reasonable care and caution in such business, on finding a short circuit in the wires carrying current into the residence, and which caused the fuse and connections to burn out, inserted pennies or copper coins, or fuse plugs of too great amperage, to-wit, plugs of 30 ampere capacity, for the conduction of the electric current, when the proper plug and plug of maximum capacity to be used was one not exceeding 15 amperes, thereby causing a dangerous, heavy and excessive amount or capacity of current to flow through said improper fuse connections to the inside wires of the residence, all the lights having first been switched on, causing the wires to heat and set fire to and burn said residence. Pleas of the general issue were interposed to these declarations.

In disposing of the assignments of error that there is no evidence to support the verdicts, and that the trial judge erred in overruling the motions made by the defendant for peremptory instructions, we must look to the record to ascertain whether or not there is any material evidence to support the findings of the jury, and must take as true the strongest legitimate view of that evidence supporting the verdicts, and disregard the countervailing testimony. In order to reverse the judgments and set aside the verdicts upon the facts, it would be necessary to determine that the evidence, wherever it is found in the record, affords no support for the findings of the jury. The verdicts in these cases rest upon circumstantial evidence, for no one saw the actual ignition of the property. However, it is well settled that negligence may be proved by circumstantial evidence. Walton v. Burchel, 121 Tenn., 715, 121 S. W., 391; 20 R. C. L., 180; 29 Cyc., 622.

On the evening in question it appeared to Mr. Lantrip and his family that some defect existed in the lighting system, because the

lights would not shine or burn when turned on. Mr. Lantrip called the defendant Company and it sent Welch to examine the lighting system and make the necessary repairs. He arrived in about thirty minutes. He went to the fuse box on the back porch and ascertained that there was a short circuit. This was found to be in the drop light in the kitchen, due to a contact of the current wire with the metallic casing of the light socket and decomposition of the rubber insulator. A short circuit operates to cause an ordinary fuse to blow out by reason of the excessive loading of current. The fuse is a safety device, a plug which is screwed into a socket in the fuse box in order to complete the connection between the service or feed wire leading into the house, and the branch wire leading to the light. Within the fuse where the contact is made there is a soft metal which when heated beyond a point of safety, will melt, break the connection, and thereby prevent the inside wire from becoming heated to such extent as to be dangerous to the building. The testimony of two expert witnesses shows that for a current of 110 volts, which was here used, and was the usual and customary current or voltage for wiring of a residence, the standard of safety required that all branch circuits of wiring in a residence should be protected by fuses of no greater capacity than 15 amperes; that a fuse of greater capacity than 15 amperes will let in to the branch wires a stronger current; that therefore it is unsafe to use a fuse plug of 30 amperes. A number fourteen wire, as were these wires in this house, can carry a current of 15 amperes, but no more with real safety. A fuse plug of 30 amperes will conduct so much current as to overheat the wires, and it might set something on fire. These are the standards set by the National Electric Code of the National Board of Underwriters, as standards of safety against destruction of property by overheated wires. It further appears that when a penny is used instead of fuse plugs, or is used as a means of metallic connection between a fuse plug and the end of the wire in the socket, its carrying amperage is even in excess of that of a plug of 30 amperes, on account of its high degree of conductibility. It further appears that it is unsafe to use "strapped" fuses, that is, fuses which have once been burned out but the brass metal on the sides of which has been turned over the ends so as to enable the metal to be a conductor at the end, instead of the soft metal which had previously melted.

The fire in question was discovered by a young son of Mr. Lantrip when he went upstairs to turn off a light in the hall just as Welch was leaving the premises upon the supposed completion of his duties. The boy saw a bright light under the door of the closet just to the right of the head of the steps. This was a small closet, the walls of which were of unfinished lumber which was very dry. Along one of these walls of wood ran two wires halfway up, but there was a

socket but no light there. The closet contained nothing but a baby bed and a box of soiled clothes. The fire originated in this closet. The insulation of such wire is rubber and cotton braid on the outside of it. It will stand 15 amperes, but no greater amperage without heating the wire. When the wire heats the rubber deteriorates and comes loose. A current of 30 amperes will, when there is a short circuit, or a partial open circuit, cause the heat to burn through such insulation and set fire to wood or other inflammable material. One of the experts testified that after the insulation would become afire, any inflammable material near it would catch as quickly as from a match or blaze. There is a conflict in testimony as to how long the overload of current complained of was on the inside wires, defendant insisting that it could not be over two or three minutes, while the plaintiffs produced testimony that it was at least ten minutes, and of course we must adopt this latter view. One of the experts was asked and answered as follows:.

"Q.    Suppose you take a small closet or room that is not ceiled, but there is plastering on the wall of the adjoining room, so that the inside of the plastering consisted of timbers or laths, it is dry, and seasoned, and wires ran up the wall of that closet, and in ten minutes after the conditions that have appeared here, after there was a short, and pennies used, and 30 ampere plugs used, the room should be on fire, just blaze out of the room when the door was opened, would you say that could be caused from the use of the pennies and the 30 ampere plugs, or not? A.    It could be, by a short circuit, as I stated before, or a loose connection."

The expert witness, McLaughlin, an electrical engineer, employed by the Tennessee Inspection Bureau with reference to the use of electricity in buildings as it affects rate of fire insurance, testified that any danger from fire from electric wires depends upon the load on the wire; that this depends on the amperage, or number of units of current, carried over the wire. The term volt applies to electromotive force, a volt being that force which steadily applied to a conductor whose resistance is one ohm, will produce a current of one ampere. Mr. McLaughlin testified that when fuses are successively applied and are blown out, a short circuit or an overload is indicated; that the use of a penny in connection with the fuse plug under such circumstances, is bad practice, although it would not probably produce a fire in a very short period of time. He said however, that if a short circuit exists and a thirty ampere fuse or a copper cent is used, the wire becomes very hot; that it is then possible while the penny is in the socket for the wires to become red hot and set fire to the building. He likened it to what happens when the current is turned into an electric iron or coffee percolator, when the moment it

strikes the wire the wire becomes red hot. He said that a hot wire is not very different from a lighted match in its capacity to set afire any inflammable material; but of course a room the size of the closet, 6x8 feet or 8x10 feet, would have to ignite in one place and then the fire would spread. The evidence is that just before the fire was discovered all of the lights in the house were burning so that these wires were loaded with all of this current passing through 30 ampere fuses.

It is difficult to deduce from the record a perfect sequence of the events occurring just before the fire was discovered especially just what things Welch successively did. However, it appears, largely from his own testimony that his course of action was substantially as follows: When he reached the house he first went to the two fuse boxes on the wall of the porch. One of these boxes received the main line wires coming into the house, and had two sockets. It later developed that the fuse of one of these sockets was blown out, which meant that 'a break had occurred in the current. The other socket had had a fuse that was strapped, that is, the metal part around the end had been pulled over the end and the current was going over this line and through the socket. The other fuse box contained four sockets and it developed that the fuses in these sockets were all strapped, so that the current was going steadily through them. The blowing out of a fuse is the melting of the soft metal within it by an overloading, or excessive amperage of the current, thereby breaking the connection. Welch first examined the fuses of the main line box. He took out the melted fuse and inserted another, which immediately blew out. He then knew that there was a short circuit somewhere in the house. He then laid a penny in the socket and it operated as a fuse, carrying a greater amperage. Thus for a short time, it is impossible to tell how long, the whole system of wires in the house was loaded with a current coming first through a penny operating as a fuse, a strapped fuse, both in the main line fuse box, and the other four strapped fuses in the other box, making the connection with the inside lines. He testified that then he loosened these last named four strapped fuses. Being convinced that there was a short circuit somewhere in the house, he went all over the house investigating all the lights, including the basement. He finally found the short circuit in the socket of the drop light in the kitchen, the wires being in contact with the metal of the socket. He testified that no current was flowing into the house wires while he was thus examining the lights, but the main line sockets contained the penny and the strapped fuse. Welch testified that he repaired the drop light in the kitchen by installing a new insulation, but this is denied by two members of the family who were present. Welch went back to the fuse boxes and keeping the penny in the socket he substituted 15 ampere fuses

for the strapped and loosened fuses in the other box, one by one, and screwed them tight, thereby completing the connection. The penny dropped on the floor and he replaced it with another penny borrowed from Mr. Lantrip. He inserted in the main line sockets 30 ampere fuses, screwing one of them against the penny to ascertain whether or not the lights would burn. Welch testified that the first penny was in about a minute, and the second penny about three minutes; that is, no longer than it took to change to the new fuses and test out each of the two inside circuits. Finally he got all of the fuses in and the lights were burning. Of course he must then have taken the penny out of the socket and used only the 30 ampere fuse in that socket. At this point, he and Mr. Lantrip went all over the house and found that the lights were burning. Thus there is evidence that a penny, through which an excessive amperage would go, was for some brief time in one of the main line sockets. Welch admitted that he knew that a penny had a greater amperage than a fuse plug, and that the use of a fuse plug of more than 15 amperes in service connections, or branch lights, would be improper. He testified, and so did other witnesses for the defendant, that the use of a penny for such purpose was customary in determining whether or not there was a short circuit. There is also evidence that when the pennies were put in the sockets by Welch, blue flames would flash back about six inches, and that these blue flames from the sockets were flashing all the time the pennies were being used. There was a can of oil on the porch, but it was not affected by the blue flame, or by the fire, having been taken off the porch while the house was burning.

The testimony is that when Welch left the house with the lights all burning and had reached the street, he was suddenly called back with the alarm of fire, and as he rushed in, he shouted to Mr. Lantrip, or members of his family, to "pull the switch." The evidence shows that there was no chimney or flue near the closet; that the inside of the closet was of rough lumber, unfinished; that the room was dry and the roof was good; that there was nothing to have dampened the closet, and no one had been in the closet that day; that the day was warm, there had been no fire in the house, except in an oil stove in the kitchen on the first floor, which was opposite the dining room over which was the closet, that is, ten to fifteen feet from immediately under the closet; that there was no way for a fire to have gotten from the kitchen to the closet; that between the oil stove and the closet were the plastered walls of the kitchen and ceiling; that the oil stove did not explode or burn up, but was removed and saved intact; that there was no fire in the furnace or grate. It further appears that about the time that Mr. Lantrip sent his son upstairs to turn out the lights, he heard a popping

noise and thinking that it was in a kettle on the oil stove, he went to the kitchen and found that there was no fire in the stove at all. It was supposed that the popping was in the closet as it was becoming afire.

There is evidence that the time consumed by Welch in going over the house the second time and going back to the fuse box, and until all of the lights came on, was about ten minutes. During this time, as aforesaid, the current was flowing in over all the wires. It is insisted that the use of the pennies could not have affected the load on the inside wires, because the connection was broken, but the evidence tends to show that this condition existed only during Welch's first examination of the lights, and that the current was flowing over the inside wires during all of the time when he and Mr. Lantrip were examining the wires and lights the second time. It is earnestly and ably argued for defendant that it was not physically possible, under these conditions, for the inside wires to have become so overloaded with amperage, and consequently overheated, that the insulation of the wires running along the wall of the closet would deteriorate and the woodwork be ignited; that the fire must have been due to some other cause. The evidence sets up no hypothesis whatever as to any other cause. The denial of Mr. Lantrip that when the fire was discovered he said to Welch that there had been an explosion, as charged by Welch, must be taken as true. Of course, there is no duty or burden upon the defendant to show the real cause of the fire if it did not result from a wire negligently overheated, and the burden was on the plaintiffs to show that it did so result. Messrs. Brown and Smith, experts of high character and long experience, testified for the defendant that the use of 30 ampere fuses on the main line sockets, and 15 ampere fuses on the branch line sockets, was proper and not attended with danger, that the use of a penny was customary for locating short circuits; and that under such circumstances a No. 14 wire could not be heated to the point of danger. This court does not discredit the sincerity or skill of these experts, but as the jury has not given weight to this testimony, we must look alone to the testimony of the other experts as well as the circumstances proved. The experts all agree upon certain particulars, but as to the probability of the wire becoming overheated and igniting the building under the circumstances, they do not agree. In this connection, it should be said that in our opinion the trial judge did not err in excluding from the jury testimony of Mr. J. P. W. Brown, offered by defendant, as to how long it would take for an overheated, or red-hot wire, to set fire to the wooden wall of the closet. The court properly held that such testimony did not fall within the category of expert testimony; that it was a matter of common knowledge, a matter of conclusion for the jury. The court allowed the expert witnesses to testify as to the

time required for heat to destroy the insulation of a wire.  An expert cannot be called upon to testify as to facts to which nonexpert witnesses have the same opportunity to know, see and testify.  Expert witnesses may not be allowed to testify as to matters which are according to the common, everyday observations of ordinary persons.

The evidence therefore tends to show that the strapped fuse plugs already in use were carrying the current into wires on which there was one short circuit, which might have already heated the wires, but not to the extent of igniting the building; that the use of pennies greatly increased the load because of the far higher conductibility of pennies which would not melt; that when the fuse plugs successively blew out it was notice to Welch that there was danger of overloading and overheating the wires, and that Welch himself knew that he was using devices contrary to standards of safety and therefore dangerous.

The evidence is that the insulation of a No. 14 wire would burn off quickly when the wire would become overheated, and that it would take about the same length of time to set dry rough finished wood on fire as it would take to heat a similar piece of pine board so that it would burn; that ignition would occur just the same as if one dropped a burning brand into the material.  It is earnestly insisted in the face of this evidence, that it was not physically possible, in so short a time, for the fire to be imparted to the wooden wall and to spread all over the closet, so that when Mr. Lantrip would reach the closet and open the door the flame would burst out and singe his hair.  Now the evidence as to the time consumed in the doing of all of these things amounted after all to mere estimates according to common experience.  It must be so treated, and evidently was so treated by the jury.  We do not speculate upon the evidence, but it is not unfair to infer that the time may have been longer than that estimated.  If the wire became red hot the insulation was quickly destroyed, and the wire being close to the very dry roughly finished wall or upright pieces of wood, the heat might have quickly set it ablaze.  The evidence is that each light turned on would increase the load on the wires because each light is a device for consuming current; that an increase of the load would create additional heat, regardless of the size of the fuse, thereby making control by fuses necessary.  In other words, the evidence shows that it would be unsafe under the circumstances, to turn on all the lights in the house, after a short circuit had caused some heating of the wires, and the use of a penny had increased the heat; and to allow this condition to continue for more than a very short time.  It is insisted that the whole theory of the overheating of this wire falls to the ground because it was not a part of the circuit on which the short circuit occurred; but the evidence does not show that this was true.

In view of this evidence, were the verdicts in these cases based on mere conjecture? Do they represent nothing more than guess work? If so, they could not be sustained. Buckeye Cotton Oil Company v. Campagna, 146 Tenn., 396, 242 S. W., 646; Pryor v. Railway Co., 2 Tenn. C. C. A., 198; Railroad v. Lindamood, 111 Tenn., 457, 78 S. W., 99. Or does this case fall within the universal rule, controlling a line of cases in our reports, that no recovery can be had if the evidence leaves it to conjecture which of two probable causes resulted in the injury, where defendant was liable for only one of them? 29 Cyc. 625; Hart v. Union City, 107 Tenn., 294, 64 S. W., 6; Railroad Co. v. Hall, 5 Tenn. C. C. A., 498; Pryor v. Railroad Co.; Railway Co. v. Lindamood; Buckeye Cotton Oil Co. v. Campagna, supra; U. S. v. Ross, 92 U. S., 281, 23 L. Ed., 707; Patton v. Texas & P. Railroad Co., 179 U. S. 658, 45 L. Ed., 361. In the last-named case it was said:

> "Where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible, and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, where there is no satisfactory foundation in the testimony for the conclusion."

In U. S. v. Ross, supra, it was said:

> "The law requires an open, visible connection between the principal and evidentiary facts, and the deduction from them, and does not permit a decision to be made on remote inference."

On the other hand, inasmuch as no facts are presented indicating any other cause of the fire, it is clear that the case must be determined according to the rule that negligence may be shown by circumstantial evidence; in other words, taking the evidence most strongly tending to support the verdicts, we must simply determine whether or not it affords ground for more than guess work or conjecture, as a basis for satisfactory conclusions by the jury. When circumstances in evidence point to a conclusion of fact in such manner as to justify the finding of such fact, it cannot be said that a jury, acting on such circumstantial evidence, and finding facts therefrom, was left to guess or speculate as to probabilities. Railroad Co. v. Hall, 5 Tenn. C. C. A., 498. In that case it was held that there was evidence sufficient to take the case to the jury on the questions of the deceased being on the railroad track, when all of the circumstances indicated that he must have been killed by the train; and the testimony of the engineer that he was on the lookout and did not see him, cannot disturb the existence of the testimony indicating that he was on the track; and it was for the jury to find whether he was on the track or not, and if he was, whether or not the statute was properly ob-

served. In Walton v. Burchel, 121 Tenn., 715, 121 S. W., 391, a leading case holding that negligence may be proved by circumstantial evidence, it was held that there was material evidence from which the jury could conclude that the fatal explosion in question was caused by the negligence of the fireman of a construction crew, where the explosion of dynamite was without any known particular cause for it, it was shown that dynamite will not explode without somebody having caused it, or without some known cause, the foreman was shown to be exceedingly reckless and careless with dynamite and other explosives, and to be considerably intoxicated, and was standing near the dynamite placed for the explosion, with a stamping stick in his hands, when a premature explosion thereof occurred, causing the explosion of a large quantity of dynamite, by him carelessly and negligently left near, which killed the foreman, the plaintiff's intestate, and two others, who were all that were near the place; and it was held that the legitimate inference could be drawn that the foreman was guilty of the negligent act which caused the explosion. The case was distinguished from Railroad v. Lindamood and U. S. v. Ross, supra, on the ground that there were established facts, from which, together with all of the circumstances and proof, the legitimate inference could be drawn, that the foreman was guilty of the negligent act which caused the explosion, although no living witness saw it. Other cases in our reports applying the rule of nonliability where the evidence showed that the damage complained of might have resulted from one of two or more causes, with only one of which the defendant might have had any connection, were cases in which there was positive evidence of the probability of the other causes, and therefore the jury was left to speculate as to which was the true cause:

As in Hart v. Union City, supra, where it appeared that the deceased had heart trouble, the alleged defects in electric wiring had been completely repaired, when it was insisted that he met his death from contact with an electric light in which there was a short circuit;

As in Pryor v. Railroad Co., supra, in which a bridge watchman was injured either by a broken car door falling, or by timber projecting from a car, which was negligently loaded;

As in Buckeye Cotton Oil Co. v. Campagna, supra, in which the verdict for negligence was based on a mere conjecture, whether the fall of a barn shed let down a pipe thereon, or the fall of the pipe knocked down the shed;

As in Nashville Railway & Light Co. v. Ida Belle Gaebler, Court of Civil Appeals, September term, 1921, in which the verdict of the jury was based upon a mere conjecture whether the deceased, a painter, merely lost his balance and fell from a mansard roof, or

was caused to fall by the induction of electric current from high tension wires running close to the roof.

The rule that the jury cannot determine by guess or conjecture between two equally probable causes of the injury, for only one of which the defendant is responsible, has no application where there is no substantial evidence of the existence of a sufficient cause, or causes for the injury, aside from the negligence charged. Deschenes v. Railroad, 69 N. H., 285, 46 Atl., 487; Crawford v. Maine Central R. R. (N. H.), 78 Atl., 1078.

In 29 Cyc., 622, 625, the general rule, deduced from a multitude of cases, was set forth that circumstantial evidence to establish negligence, must be such that negligence can reasonably be inferred from the facts shown, or such as to satisfy reasonable minds thereof; that there must be more than a mere probability that the defendant was negligent; but that the plaintiff is not bound to exclude the possibility that the accident might have happened in some other way than alleged, but is required only to satisfy the jury by a fair preponderance of the evidence that it occurred in the manner alleged. The facts must tend to exclude any other cause, but the inference of exclusion of any other cause than that alleged need not be reached beyond doubt. In McRainey v. Va. & C. S. Railway Co., 168 N. C., 570, 84 S. E., 851, it was held that where after a fair consideration of the circumstantial evidence the more reasonable probability is in favor of negligence, the case is for the jury. In Warner v. N. Y. O. & W. Railway Co., 204 N. Y. S., 607, it was said:

"When one reasonable mind can infer from all the evidence that a controlling fact was proved, while another reasonable mind can infer that it was not proved, a question of fact is presented . . . it is the province of the jury, not only to pass upon conflicting evidence, but where different inferences may be drawn from the evidence, to determine the inference . . . the establishment of facts clearly showing that through a reasonable inference, a logical conclusion may be reached that the injury resulted from a negligent act, is sufficient."

A cause being shown which might produce an accident, and the evidence showing that an accident of that particular character did occur, it is a warrantable inference, in the absence of showing of other cause, that the one known was the operative agency in bringing about the result. Farmers Mercantile Co. v. Railway Co. (S. Dak.), 146 N. W., 560; Swaim v. C. R. I. & P. Railway Co. (Iowa), 174 N. W., 384.

In Adams v. B. H. & S. Mining Co., 12 Idaho, 637, 89 Pac., 624; 11 L. R. A. (N. S.), 852, it was said:

"There are very few things in human affairs, and especially in litigation involving damages, that can be established to such

an absolute certainty as to exclude the possibility, or even some probability, that another cause or reason may have been the true cause or reason for the damage, rather than the one alleged by the plaintiff. But such possibility, on even probability is not to be allowed to defeat the right of recovery, where the plaintiff has presented to the jury sufficient facts and circumstances surrounding the occurrence as to justify a reasonable juror in concluding that the thing charged was the prime and moving cause. As said by the court in Texas & P. R. Co. v. Gentry, 163 U. S., 353, 41 L. Ed., 186: 'When a given state of facts is such that reasonable men may differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must determine the same conclusion from them that the question of negligence is ever considered as one of law for the court.'

"In the syllabus to Sioux City & P. T. Co. v. Stout, 17 Wall., 657, 21 L. Ed., 745, it is said: 'If upon any construction which the jury is authorized to put upon the evidence, or by any inference they are authorized to draw from it, the conclusion of negligence can be justified, the defendant is not entitled to a nonsuit; but the question of negligence must be left to the jury.' "

If reasonable men may fairly differ on the question of negligence, the verdict should not be set aside.

There is a multitude of reported cases in which the origin of fires was proved by circumstantial evidence, no one having witnessed the inception of the fire. The case of Romano v. Vicksburg Railway & Light Co. (Miss.), 39 So., 781, was an action for damages by fire caused by defective wiring. A peremptory instruction for defendant at the close of the case was held erroneous, the court saying:

"The circumstances attending the fire; the fact that there had been no fire in the building for a number of hours; the fact that the fire originated at the exact place where the electric wires entered the building; the defective character of the wires used in insulating the electric features; the negligent and unworkmanlike manner in which the connection was made with partly insulated wires; the probability of fire being caused thereby—all these things standing undisturbed and unexplained, demonstrate the correctness of the ruling; hence it was error to grant the peremptory instruction for appellee at the conclusion of the case."

In Hanton v. New Orleans & C. R. L. & P. Co., 124 La., 562, 50 So., 544, it appeared that the evidence on the trial satisfied the jury that on the day of the fire which injured plaintiff's dwelling, the defendant company, by its fault, passed through the wires by which the house was lighted, a current of electricity of greater power and

strength than the fixtures in the house were prepared to receive and meet. The Supreme Court held that it was not prepared to say that the conclusions of the jury were erroneous.

The facts of these two last-cited cases involve some details differing from those in the case before us, but they illustrate the rule that where the jury might reasonably have reached their inference, their verdict will not be disturbed; and they also present sufficient analogy to the case before us to strengthen the impression of this court that this case was properly left to the jury.

Applying to the case before us the rules and principles which we have endeavored, at perhaps too great length, to set forth, we are of the opinion that the conclusion of the jury that the fire which burned the house and personal property, originated in a negligent overloading of the wires by defendant's employee, was based upon evidence of some substance and relevant consequence; that the inference was not arbitrary and without evidence that there was negligence. The absence of evidence of any other cause; the absence of evidence of previous defects, or of accidents from the use of the apparatus; the overloading of the wires by the use of the pennies and the strapped fuse; the serious probability that this would overheat the wires, cause the insulation rapidly to deteriorate, and cause the red hot wire to ignite the dry, roughly finished soft wood—these and other circumstances, show more than a mere probability that this was the origin of the fire. We cannot say that the jury, in accepting this evidence, and rejecting the conflicting evidence tending to show the impossibility of such origin, made unreasonable inferences. In other words, we are of the opinion that the jury acted within its powers, and it is not for the appellate court to disturb its verdict. Other questions waived, the defendant would therefore be liable under the rule respondeat superior.

Two assignments of error are based upon the refusal of the trial judge to instruct the jury, upon request of counsel, in substance that if they should find that Welch put a penny in one of the main line fuse sockets and thereby ascertained that there was a short circuit somewhere in the house; that he found the short circuit in the drop light in the kitchen and corrected the same; that then he removed the penny from the main line fuse socket; and that the fire in the closet was not the direct and proximate result of putting the penny in the socket of the main line fuse box, then the verdict should be for the defendant. Also that if the jury should find that the room in which the fire originated was not plastered or ceiled on the inside, that it contained only a small empty baby bed and a box with some soiled linen in it; that it was not possible for the fire to have started and gained the headway that it had when it was first discovered, as the direct and proximate cause of Welch putting a penny in one of the

main line fuse sockets and keeping it there for a period of two, three or four minutes for the purpose of locating the light trouble in the house, then, and in that event, the verdict should be for the defendant in both cases.

It is true that it is the right of every litigant upon reasonable and appropriate requests, to have his theory of every material issue of fact submitted to the jury on a correct charge of applicatory law. Railroad v. Egerton, 98 Tenn., 541, 41 S. W., 1035; Memphis Street Railway Co. v. Newman, 108 Tenn., 669, 69 S. W., 269. But of course an instruction requested must be strictly correct; otherwise the Circuit Judge cannot be put in error by his refusal to charge it. P. R. & Co. v. Naive, 112 Tenn., 239, 79 S. W., 124, 64 L. R. A., 443; Knoxville v. Cox, 103 Tenn., 368, 53 S. W., 734. An instruction that would be limited to one specific act of negligence, to-wit: the use of a penny, would not be correct, because it would not cover any other act of negligence, as the continued use of the strapped fuse in the other main line fuse socket; for the effect of such instruction would be an invasion of the province of a jury by the exclusion from its consideration of any other act of negligence than that specified in the instructions requested, that is, the use of the penny. In giving such instructions the trial judge would have said to the jury that if they should find that the fire did not originate from the use of the penny alone, the plaintiffs could not recover. There was some evidence that Welch was negligent in allowing the fuse plugs connecting one of the inside circuits with the main line to remain in the sockets while he had the penny in one of the main line sockets and a strapped fuse plug in the other. The instructions requested would have precluded the jury from considering this evidence.

The insistence that the verdicts were so excessive as to indicate passion, prejudice and caprice on the part of the jury, cannot be sustained. The evidence shows that the house was totally destroyed; that the replacement value of the house as originally constructed was $4680; that it had been kept in good condition and had been repaired so as to be in first class condition shortly before the fire, at a cost of $292.57; and that the reasonable and fair value of the building as it stood just before the fire was about $4500. A verdict for $4000, based upon such facts, was certainly within reason and did not indicate excessiveness. It is insisted that the judgment for $1500 for the value of the personal property destroyed cannot be sustained because it is not based upon any evidence of value, other than the testimony given by Mr. and Mrs. Lantrip; nevertheless they gave a description in detail of this property and its value, based upon the cost and the extent of use to which it had been put. The value of the articles which could be precisely valued by these witnesses was given as $1264. In addition, it was shown that there were destroyed certain

wall pictures, framed photographs of children, an oil painting of a little daughter of Mr. Lantrip, which could not be reproduced; and notes and outlines of sermons, representing three of the best years of labor and research of Mr. Lantrip as a minister. It was admitted that upon these articles a pecuniary value could not be placed, but it was insisted that they were invaluable, upon sentimental grounds, excepting the sermons, which had a substantial value. Mr. Lantrip by an appropriate assignment of error, contends that it was error for the trial judge to require a remittitur of $500, and that the verdict for $2000 should be restored and approved.

The defendant insists that the goods destroyed were not worth one-third of $1500, but there is no evidence to sustain this insistence, and the jury has based its award upon material evidence.

The action of the trial judge in requiring a remittitur is' entitled to very great weight in the appellate court. Baker v. Bates, 4 Tenn. C. C. A., 175. The award of $1500 more than covers the value of the personal property, with the exception of the outlines of the sermons. This item of value was evidently taken into consideration by the trial judge in approving a verdict for as much as $1500. Of course the sermon outlines would have no market value, however much intellectual effort and scholarly research might have produced them; but when property has no market value, the recovery is not restricted to nominal damages only, but its value for the plaintiff's damage must be ascertained in some other rational way, and from such elements as are attainable. In such case the proper measure of damages is generally its actual value, or, as is sometimes said, its value to the owner, taking into account its cost and such other circumstances as may affect its value in the particular case. 8 R. C. L., 488; Southern Express Co. v. Owens, 146 Ala., 412, 41 So., 752; 119 A. S. R., 41; 8 L. R. A. (N. S.), 369; Jonas v. Noel, 98 Tenn., 440, 39 S. W., 724. The Owens case, supra, is a leading case, involving the question of damages for the loss of a History of South Carolina Literature in manuscript. The aforesaid rules were laid down and applied in that case.

The insistence upon the full amount of the verdict, $2000, amounts to a valuation of $736 upon a few pictures and the outlines of sermons. In view of the inability of the plaintiff himself to fix a monetary value upon the sermon outlines; in view of the very full valuation placed upon that property, the value of which could be given; in view of the resultant fact that the sum of $1500 did include a substantial valuation of the manuscripts; and in view of the weight justly to be given to the requirement of a remittitur by the trial judge, we are of the opinion that his action should not be disturbed.

It results that all of the assignments of error in behalf of both the defendant and the plaintiff, Mr. Lantrip, are overruled. The

judgments of the circuit court in these cases are affirmed. The costs of the appeal will be adjudged against the defendant. Judgments will be entered in this court for the amounts awarded in the circuit court, with interest on each amount from the date of the judgment in the circuit court.

Faw, P. J., and Crownover, J., concur.