GEORGE W. McCRAVY and PEARL LASTER *v.* THE STATE
OF TENNESSEE.

(*Knoxville.*   September Term, 1915.)

1. **HOMICIDE.   Offenses.   Evidence.   Sufficiency.**

  In a prosecution for assault with intent to commit murder in
  the first degree, evidence *held* insufficient to warrant convic-
  tion.   (*Post, pp.* 366, 367.)

2. **CRIMINAL LAW.   Evidence.   Expert testimony.**

  In a prosecution for assault with intent to commit murder in
  the first degree, a medical expert, while qualified to testify as
  to the range of the bullet, is not qualified to testify that the
  prosecuting witness, who was found with the revolver in her
  hand, could not have inflicted the shot herself, for that was the
  ultimate question for the jury, and any person reasonably fa-
  miliar with firearms could draw as accurate a conclusion as
  the medical expert.   (*Post, pp.* 367-369.)

  Case cited and approved:   Telephone & Telegraph Co. v. Mill Co.,
  129 Tenn., 374.

---

FROM GREENE.

---

Error to the Circuit Court of Greene County.—DANA
HARMON, Judge.

SUSONG & BIDDLE, SWINGLE & SUSONG and J. AUTHUR
ATCHLEY, for plaintiffs in error.

WM. H. SWIGGART, JR., Assistant Attorney-General,
for the State.

MR. JUSTICE FANCHER delivered the opinion of the Court.

The defendants were indicted jointly for assault with intent to commit murder in the first degree upon Mrs. George W. McCravy. The two defendants were convicted of the charge.

On Thanksgiving Day, November 26, 1914, Mrs. Mc-Cravy, wife of defendant George McCravy, was shot in the arm and head. The doctor who attended her stated that the ball entered the left side of the head above the left ear and to the front near the temple, ranging about half an inch downward, coming out on the other side of the head. The next day he discovered a bullet wound also in her left arm above the elbow, and he stated that this wound indicated that the ball had entered from the outside of the arm, coming out on the inside next to the body. The theory of the State was that both these wounds were from one pistol shot, and that her left arm was evidently thrown up to guard against the assault when both wounds were received.

The proof is entirely circumstantial. George Mc-Cravy and Pearl Laster had been on intimate terms for some months prior to the shooting, and he admits illicit relations with her. The sister of Mrs. McCravy had been staying to assist in the household work, Mrs. McCravy being an invalid; but there was some little friction between the two sisters, and she left. Thereupon Pearl Laster was employed and had remained in the household for some two months previous to the

shooting.   At one time she had been forced to leave by relatives of Mrs. McCravy.   One of these relatives who compelled her to leave was also shown to have been unduly intimate with Pearl Laster.   McCravy visited her while she was away, probably twice.   It seems that the wife of McCravy made no objection to the Laster woman staying with her, and they got along amicably. Whatever illicit relations there were between Pearl Laster and George McCravy seem to have been with the consent of Mrs. McCravy, although defendant said that no such relations were maintained while the Laster woman was in the household.   The proof shows, and Mrs. McCravy admitted on the witness stand, that she was not averse to her husband maintaining illicit relations with other women because of the fact that she was an invalid.

The night before the shooting McCravy came home with some whisky, which he stated was for his wife. The proof shows that she drank whisky and so did he. She testified that her husband was always kind to her, and also that the Laster woman was kind to her and the children.   The next morning Mrs. McCravy, Mrs. Laster, and the children arose and had breakfast. Shortly after breakfast, Mrs. McCravy went out to the closet, a short distance from the house, where the shooting took place.   The State introduced a number of witnesses showing illicit relations between McCravy and the Laster woman, consisting of admissions made by him, and two letters alleged to have been written by him to her in very endearing terms.   Mrs. Laster and

Mr. McCravy and the nine year old son of the McCravys, named Cubert, made statements immediately after the shooting as to how it occurred. Mrs. Laster did not go upon the witness stand. The State introduced Mrs. McCravy, but she remembers nothing about the occurrence and has no recollection of what transpired the night before, or that morning. Soon after the shooting, the defendants were arrested, and the defendant George McCravy was placed in jail. After that time he did not see his wife and son and had no communciation with them. They had been taken by his wife's people, with whom they stayed until the trial. The attorney for McCravy did not see the little boy until the day before he was introduced as a witness by the defendant, and was then only permitted to talk with him in the presence of the physician, Dr. Myers, who was a disinterested party. The boy made his statement without suggestion from the attorney, and in effect it was the same that he had made immediately after the shooting and to other parties, and was the same as statements made by George McCravy and the Laster woman on the same day of the shooting. He said that he had been told to go to the spring by his mother and Mrs. Laster. This spring was shown to have been about two hundred yards southwest of the house. He said that his mother was in the house when he left, and that when he returned and had reached the gate he heard a pistol shot up about the closet, which was north of the house. He went in and asked the Laster woman who shot, and she replied that she did

not know and did not care. He was then told to cut some firewood, and went out to a place between the house and the closet where he was engaged in chopping off a stick. When he had about half finished cutting the stick in two, he saw his mother coming out of the closet door, letting a pistol drop from her hand as she started; that she came outside and fell beside the door. He then began to scream for his father to come. He said that his father was in bed at the time; that he had noticed him just before he went out of the house in the same position he had been lying from the time he (the boy) got up before breakfast, apparently asleep. The father hurriedly put on his pants and socks and ran out and took hold of his wife and said to her, "What do you mean?" and she laughed and said, "Oh, nothing," and that the "younguns" aggravated the life out of her and she tried to get herself out of the way. Defendant carried her in the house and placed her on the bed and immediately telephoned for the doctor. When the doctor and others arrived, defendant gave his statement, which was practically the same as that told by the little boy. Mrs. McCravy said that she did not shoot herself, but upon further examination she indicated that she only meant by this that she did not know anything about shooting herself, and that she had no recollection whatever in regard to it. She said that she started to see her husband before the trial, but that her brother would not let her go, and that she had not talked to her husband since she was hurt. She said that she knew how to

fire the pistol, which was a Colt's automatic; that "all you had to do was just to pull the trigger." She had previously fired the pistol.

Dr. Myers testified that the Laster woman told him that Cubert was at the wood pile chopping wood, as stated by Cubert, and he (Dr. Myers) went out and saw the stick which had been half cut in two by the boy.

McCravy's character before this affair came up was shown by all the witnesses to have been good.

The main facts relied upon for the conviction are that Dr. Myers stated that Mrs. McCravy could not have inflicted the wound in her left arm and through the head herself, thus indicating that it must have been done by some one else, and the further theory of the prosecution is that, as McCravy was keeping the Laster woman, it was his desire to get rid of his wife in order to maintain relations with or marry Mrs. Laster.

When Pearl Laster was arrested by the officers, she was induced to make a statement, to the effect that McCravy did the shooting so that she and McCravy could get married; that he tried to get her to do the shooting, but she would not; and that he jumped out of bed and ran out of the house in his nightclothes while Mrs. McCravy was in the closet, shot her, and ran back and jumped in the bed. On the trial, however, the Laster woman was not placed on the stand. After this statement was made by her, witnesses testified that McCravy made statements rather indicating that Mrs. Laster might have done the shooting, but he nowhere admitted that he was awake or knew anything about it

until called by the boy. After the shooting McCravy exhibited considerable emotion, and in speaking of his wife to the doctor his eyes were filled with tears. On the witness stand when he was detailing how he found his wife shot and all about the incident, the stenographic notes show that he wept. The proof is positive and uncontradicted that he got along well with his wife. The Laster woman was married, and it could hardly be supposed that McCravy had any intention of marrying her. Whatever illicit relations that existed were entirely agreeable to Mrs. McCravy, so that we can see no overpowering motive upon the part of McCravy to murder his wife, for whom he seemingly had affection, and who was the mother of his four children. From Mrs. McCravy's testimony it is evident that she does not believe her husband shot her. The boy, Cubert, gave a very clear and rather convincing statement, without any contradiction whatever. So far as the particular facts proven are concerned, they indicate most strongly that Mrs. McCravy fired the shot with suicidal intent. The fact that she does not remember anything about it may be due to the injury to her head, or it may indicate that she was insane at the time. The Laster woman is a vacillating, weak character, of lewd habits, and her statements made to the officers evidently while under pressure, and to which McCravy had no power to cross-examine, are not very conclusive to indicate a conspiracy between the two defendants to commit the crime. So far as her statement could indicate otherwise than to show a conspiracy, it

can only be treated as a confession upon her own part, and not as evidence to show the guilt of McCravy. It was probably nothing more than a weak and forced effort to throw the responsibility upon McCravy and becomes a witness for the State in order to be released from custody herself.

The most difficult fact to get over by the defendant is the testimony of the doctor as to the range of the bullet, the position of the wounds, and his statement that these wounds could not have been inflicted by Mrs. McCravy. However, we are not convinced that it was impossible for Mrs. McCravy to have fired the shot or shots. There could have been more than one shot fired. There is a possibility that the doctor was mistaken as to the range of the ball, although he was probably correct in his conclusion. He gave no reason, however, showing why he knew the ball ranged from the left to the right side. He is evidently an honest, straightforward, and competent man; but we are not convinced from his testimony that he was correct in his conclusion that this ball could not have been fired by Mrs. McCravy, passing through the left arm and through the head as he indicated. He is not shown to be an expert on the use of firearms.

Mrs. McCravy was probably a slender woman. While a stocky built, fleshy person could not without difficulty reach around and fire a shot into the left side of the head, it is very apparent to us that a slender person could do so, and we see no reason why such person could not also fire through the left arm at the

same time. Mrs. McCravy may have used her left arm to shield her face from the fire of the pistol. She could have pulled the trigger with her thumb, holding the stock of the pistol in the same hand, with the weapon pointed toward her head and against the outside of her arm thrown up against the side of her head. The closet where she was shot was very small, and marks upon the side of it, proven by some of the witnesses, indicated that the bullet struck about sixteen inches above the seat where she was probably sitting, and struck the side of the wall to the right as one faces the door. A bullet would not have so ranged if shot from the door. The bullet was afterward found on the floor. A spot of blood was also on the floor.

In view of the positive and uncontradicted testimony as to the material facts in the record, we do not believe the proof sustains the verdict, but rather that there is a preponderance of proof against the verdict, especially when considered in view of the requirement that in order to convict upon circumstantial evidence alone the proof must be so strong and convincing as to exclude every other reasonable hypothesis than that of the defendant's guilt.

There are some assignments of error in the record as to the admission of evidence, consisting of the alleged letters written by George McCravy to Pearl Laster, also proof of certain telephone conversation between McCravy and Pearl Laster; also, as to allowing the State to introduce proof of statement by the defendant Mrs. Laster tending to incriminate, not her-

self, but defendant McCravy after. she had refused to testify.

We do not regard these assignments as of sufficient importance to merit a reversal. The Laster woman refused to go upon the stand at the close of the testimony for the State, and testify in her own behalf. Afterward, the State introduced proof as to these conversations, in which Mrs. Laster undertook to incriminate McCravy, and thereafter her attorney asked permission to permit her to go upon the stand, saying that the reason she had not originally taken the stand was that they did not regard the proof against her sufficient to make it advisable for her to testify in her own defense. As to whether she ought to have been permitted to testify after the introduction of these conversations, the court will indicate no opinion, as this will probably not occur again in case there is a new trial. The court will say, however, that it appears she desired to take the stand after these statements were proven, and was not permitted to do so by the court.

There is one assignment of error in regard to admission of testimony which we do deem of sufficient importance to rule upon, and that is as to the alleged error of the court in allowing Dr. Myers to testify, over the objection of defendants, in substance, that it would not have been possible for the injured woman, Mrs. McCravy, to have shot herself in the manner in which she was shot. We think that his testimony was competent giving his opinion as to the range of the bullet. He did not say that he was a man of experience

in the treatment of gunshot wounds, but no exception was taken to his testimony on the ground that he had not qualified as an expert, and we think an expert may properly testify as to the range of a bullet through any part of the human body. That involves a question of anatomy and is sufficiently scientific in its nature as to admit of expert testimony. We are of opinion, however, that it was error to permit him to give his opinion as an expert, or to state as he did, in substance, positively that the bullet could not have been shot by Mrs. McCravy in the manner in which she was shot. Testimony is permissible allowing an expert to state a conclusion or give an opinion on a subject which is peculiarly a matter of superior knowledge on his part, for the reason that the lay mind is not so competent to form an opinion or reach a conclusion. Such expert opinion or conclusion, however, may be permitted only in matters peculiarly within the knowledge of an expert. The question whether a delicate woman can reach around with the right hand and shoot herself in the left side of the head, or whether she can do so at the same time shooting herself through the left arm, is not peculiarly a matter of expert learning upon the part of a physician. This is a conclusion which the ordinary practical mind may reach, as well as the trained physician, and can be more readily reached by one trained in the use of firearms. Whether Mrs. McCravy shot herself was the ultimate fact to be reached by the jury, because if she shot herself it necessarily follows that both defendants were innocent. To permit the

McCravy et al. v. State.

doctor to say whether it was possible for her to do this, when the jury could as well reach the same conclusion, was an invasion of their province. *Telephone & Telegraph Co. v. Mill Co.*, 129 Tenn., 374, 381, 382, 164 S. W., 1145.

It is not a question of anatomy, but a question of the physical use of the hand and arm with a Colt's 25 automatic revolver, as to whether this wound could have been self-inflicted. The doctor introduced by the State may have known very little about the use of such firearms. A slender, wiry person, such as this woman doubtless was, who knew how to use a weapon like this as she did, may have been able to inflict the wound as described by the doctor. The sleeve of the knit under garment through which this bullet passed going through Mrs. McCravy's arm was introduced as an exhibit to the testimony and has been inspected by us, and it is our opinion, from an inspection of the bullet holes and the blood stains upon the garment just above the curve of the elbow of same, that there is a probability that this woman could have fired the bullet through her arm and through the head if her arm was placed against the side of the head, by reaching her right hand around and firing against the arm. It was only a small wound in the arm, going slightly through the lower or back part of the arm.

For the reasons indicated, the case is reversed and remanded.