TENNESSEE ELECTRIC POWER COMPANY v. E. D. ROBINSON et al.

Middle Section. July 13, 1928.

Petition for Certiorari denied by Supreme Court, November 23, 1928.

H. B. Frater and M. C. Hill, of Sparta, L. A. Ligon, of Carthage, and O. K. Holladay, of Cookeville, for plaintiff in error.

H. B. McGinness and W. H. Turner, of Carthage, for defendants in error.

DeWITT, J. On August 21st and 22nd, 1926, the defendants in error E. D. Robinson and Odell Mason (plaintiffs below) were the owners of a crop of growing corn on Powell's Island, a fertile is-

land of about ten or twelve acres, in Caney Fork River in Smith county, about sixty-nine miles by river below Rock Island, where the plaintiff in error, a public service corporation, maintained a hydro-electric power plant, including a dam across Caney Fork River just below the mouth of Collins River. On the evening and night of August 21st, and on August 22nd the island containing the crop of corn was overflowed by the waters of the Caney Fork River and the crop of corn was seriously damaged, if not destroyed by the high water.

This action was shortly thereafter instituted by said owners of the corn, to recover from the Power Company damages, on the ground that it, through its agents and servants, by opening flood gates in its dam at Rock Island, "did wrongfully and negligently release large quantities of water then and there collected and impounded above its said dam, into the channel of said river, thus greatly increasing and accelerating the natural flow of the water in said river and greatly raising the level of the water of said river, causing the waters thereof at the time and place aforesaid to overflow, damage and destroy plaintiffs' said corn."

Upon a plea of not guilty the cause was heard by consent before the Circuit Judge sitting without the intervention of a jury, after it was once tried before the Circuit Judge and to a jury and a mistrial resulted; and the Circuit Judge found the issues in favor of the plaintiffs and rendered judgment in their favor for the sum of $275 and costs. The assignments of error in behalf of the Power Company present three propositions which were embodied in the motion for new trial: (1) That there is no evidence to support the findings and judgment of the court; (2) That there is no evidence to show causal connection between the action of the defendant and the damage alleged to have been suffered by the plaintiffs; and (3) That there is no evidence to show negligence on the part of the defendant.

Counsel for plaintiff in error rely upon some earlier cases for their insistence that the findings of the Circuit Judge sitting without the intervention of a jury, have the same force and effect as a verdict of a jury, but will be set aside by the appellate court where there is no competent evidence to support it, or unless there is a clear preponderance of the evidence against the finding; but the rule is now clearly settled that without any qualification, if there is any evidence upon which the judgment can be sustained, it must be affirmed on appeal, and that the appellate court must take that view of the evidence which is most favorable to the plaintiff below. Peoples National Bank v. Swift, 134 Tenn., 175, 183 S. W., 725; Hinton v. Insurance Co., 110 Tenn., 113; Tennessee Central

Railway Co. v. Vance, 3 Tenn. App. Reps., 152; Weinstein v. Barrasso, 139 Tenn., 593, 202 S. W., 920.

The defendant Power Company insists that the findings are contrary to natural or scientific facts and principles, based upon evidence so vague, uncertain, speculative and pure opinion, as not to support the findings; contrary to undisputed evidence that the natural stream flow of the river was not obstructed or accelerated, and that the maximum downflow from the dam and power house was never exceeded by the maximum flow of water above the dam; and that therefore the crest of the flood could not have been increased and the plaintiffs' crop damaged beyond what would have occurred had the dam never been built.

The elementary law of waters is not in dispute—that one who interferes with the natural current of a stream is responsible absolutely, and without any question of negligence, for damages thereby caused to one who is entitled to have the water flowing in its natural state (Coal Co. v. Ruffner, 117 Tenn., 180, 160 S. W., 116; 9 L. R. A. N. S., 923); that one who constructs and maintains a dam has no right to discharge the contents of the pond thereby made so as to increase the flow of the water course beyond its natural capacity, to the injury of the lower riparian proprietor (27 R. C. L., p. 1099; 30 Amer. & Eng. Ency. of Law, 377; 8 Id., 717; Taylor v. Indiana, Michigan Electric Company, — Mich., —, 150 N. W., 739; L. R. A. 1915 E., 294; Carriger v. Railroad, 75 Tenn., 388). The issue is purely one of fact, and we must look alone to the evidence tending to support the findings and judgment and disregard all countervailing evidence. Of course if the supporting evidence is utterly contrary to physical facts, or if there is undisputed evidence contrary to the findings, such evidence may also be looked to in determining whether or not there is any material evidence to support the finding.

The defendant company's dam is seventy-five feet high, running 800 feet across the Caney Fork River just below the mouth of Collins River. This forms a pool or reservoir in the Caney Fork River and its tributaries some sixty miles long and comprising 2200 acres. Between Collins River and Caney Fork River is a narrow but high neck of land through which the Company constructed a tunnel which carries the water 1700 feet to the Caney Fork side, where it drops perpendicularly through steel pen stocks to a power house and by the operation of turbine engines causes the generation of electric current by other machinery. This power house is situated about three-fourths of a mile in a gorge of the river below the dam. The water so used passes through the power house and through tail races into Caney Fork River. The dam is built of con-

crete and is of Taintor gate, or flood gate type, as distinguished from the spillway type. and it is one of the recognized standard types of dam. Set in the face of the dam and forming a part of it are eighteen flood or Taintor gates, each twenty-five feet high and fourteen feet wide, so arranged that they can be raised and lowered mechanically to any desired height. The top of each gate is set flush with and forms a part of the top of the dam. The Caney Fork River and its tributaries drain a total area of 2620 square miles, 640 square miles being above the dam, and approximately 500 square miles between the dam and the island of the plaintiffs. The river rises in the Cumberland Mountains as do its principal tributaries above the dam, Rocky River, Calf Killer River, Collins River and Cane Creek. There is evidence that the river is subject to sudden rises, due to the fact that these streams run through rocky gorges or canyons for the most part. Between the dam and the plaintiffs' island seventeen creeks drain into the Caney Fork River. During the month of August, 1926, there were exceptionally heavy general rainfalls over the drainage area of the Caney Fork River, the rainfall being the greatest recorded in the month of August, with one exception, over a period of forty-four years. Between the 17th and the 21st of August, according to the United States Weather bureau reports, there were heavy rains all over the Caney Fork basin culminating in a rainfall of four and twenty-two hundredths inches at Rock Island in the early morning, three inches at Walling, two miles above the dam, in the early morning of August 21, 1926. Beginning at eight a. m. on August 21st and continuing to 9:25 a. m., the defendant company opened five of the flood gates in the dam, one having been continuously open since 3:45 p. m. on the preceding day, making a total of six gates open at 9:25 a. m. At that time the water was running over the top of the dam to a height of seventy-seven feet or about nine inches above the dam. The maximum inflow was reached at 9:30 a. m. The maximum outflow from the dam and power house was reached at ten a. m. By noon the level of the pool had been reduced to the top of the dam and during the period from noon until eleven p. m. the reservoir level was further reduced to a point one and seventy-four hundredths feet below the top of the dam. One gate had been closed at 6:45 p. m. and two more were closed at eleven p. m. when the pond or pool level began to increase gradually, although three gates were still open.

It appears that the heaviest rainfall in that region was at and immediately above Rock Island; that on the very day, the 21st that the rainfall was four and twenty-two hundredths inches at Rock Island, and three inches at Walling, there was only four-tenths of an inch of rainfall at McMinnville, fifteen miles away,

none at Crossville in the region near the head of the river; eleven-hundredths of an inch at Cookeville; one and thirty-nine hundredths inches at Carthage, and fifty-six hundredths of an inch at Liberty, which were in the region below Rock Island. The rainfall for the preceding three days at Walling and Rock Island was as follows:

|  | August 18th | 19th | 20th |
|---|---|---|---|
| Walling | 2.10 | .25 | .75 |
| Rock Island | 1.6 | 1.39 | .55 |

The testimony of defendant's engineer, Mr. Crouch, is that it was the intention of the company to maintain the pool level at the top of the gates, for the water above that level would back up upon the lands of upper riparian proprietors; that during the nine or ten hours in which the flood gates were opened in the endeavor to maintain this pool level a little over two billion gallons of water was drawn out of the pool in addition to the amount that was flowing in above the dam; in other words, this was the amount of water that was drawn from the pool, and that it required the whole flow of the river for twelve hours thereafter to refill the pond.

As aforesaid, the plaintiffs claimed that the loss of their crop was due to the increase of volume and acceleration of flow, beyond the natural volume and flow, due to the negligent opening of the gates in the dam.

The crucial question is, is there evidence tending materially to show that the operation of the dam and the power house so changed the natural flow of the water that the volume was increased and the crest heightened at the island so as to overflow it and destroy the crop? It appears that the island was overflowed for the first time in the summer season in more than thirty years; but also that although the rain on the 21st was largely a local rain, it was the heaviest which had fallen at and above Rock Island in forty-four years. It also appears that the opening in the dam was 150 feet long and fourteen feet high, and that this did let loose an enormous body of water under very heavy pressure. The evidence is that it takes about ten hours for such a volume of water to flow from the dam to the island, sixty-nine miles away.

The plaintiffs' witnesses testified that on Saturday, August 21, 1926, the river at their island and other points below and nearby was at an apparently high stage, about twelve feet above low water mark, and almost to the point where it would overflow the island and other low lands in the vicinity; that in the afternoon of that day the waters began to recede and at nightfall had gone down about two feet; but during that night and the forenoon of the next day, the 22nd, there was a second rise attaining a height of about twenty-one and one-half feet. This was the rise which

overflowed the island. There is much testimony that this second rise, when there was no further rain, was an unusual and apparently unnatural phenomenon. This rise reached its peak about noon of August 22nd.

It was admitted by defendants' expert witnesses that the rise which overflowed the island was due to this release of the water through the gates. But they also testified that in the absence of this the water would have gone to the same height and perhaps in a shorter time. Mr. Crouch admitted that probably more water contributed to the rise, that passed through the gates of the dam than came from any other source and that this helped the rise generally. At Silver Point, a place forty-one miles below the dam and twenty-eight miles above the island, there was a river gauge. It appears that on August 21st at ten a. m. this gauge stood at seven and six-tenths feet; at noon at eight and seven-tenths feet, at six p. m., twelve and seven tenths feet, at midnight, eighteen and seven-tenths. It also appears that the Nashville Bridge Company was at that time building a bridge across Caney Fork River at Sligo, about three miles below Silver Point or forty-four miles below the dam; that pursuant to an understanding between the bridge builders and the superintendent of the Rock Island Plant, the superintendent of the plant notified the bridge builders by telephone that the gates had been opened and that the flood was coming, in order that they might remove their tools and other material that were along the edge of the river. The construction superintendent of the Nashville Bridge Company testified that he knew that when the gates were opened it "would raise the river a good deal." An employee of the Power Company went, on that morning from Rock Island to Buffalo Valley, some few miles below the island, to take care of a valuable gauge which the company had on the river at that point; and he testified that he knew that the river was going to rise and that one of the causes of the rise would be the opening of the flood gates in the dam.

A number of witnesses testified that from their observation of the river in connection with rises occasioned by the discharges of water through the tubes and the tail races in the ordinary operation of the plant, the water flows down the river at a greater velocity than when the rises have been occasioned by rainfall. One witness said, "I noticed that it would pile up and that it is done lawful quick; when I get in sight of the river I can see the water rolling against the bank."

The plaintiff in error insists that at no time did the outflow exceed the inflow and its counsel asked hypothetical questions of Mr. Bateman, an expert, introduced by him, and of Mr. Currey, an expert introduced by the plaintiffs. These hypothetical questions

contain the assumption that the maximum outflow never exceeded the maximum inflow. Mr. Batement testified that the crest would not have been increased under such circumstances, and so did Mr. Currey, but Mr. Currey said that if the maximum outflow did not exceed the maximum inflow the effect of the operation of the gates would be to increase the stream flow. Now Mr. Crouch was asked and answered the following questions:

"Q. There never was more water going through the dam and through the power house than the maximum inflow into the dam? A. No. sir."

"Q. Was there any time during that period when the outflow from the dam exceeded the inflow, if you say yes, what was the cause of it? A. Yes, when these six gates were opened they were opened to take care of that flood crest that reached the dam between 9:30 and ten o'clock on the 21st of August; these gates were kept open several hours after that and that brought the pond down to normal level and took care of the additional flood which we knew was coming as we considered that conditions at that time were ideal for a flood. We had already taken care of the big crest that had run over the gauge at Rock Island and which showed a very heavy rainfall; so that when we saw that there was another flood crest coming down the river, we pulled the pond down so that we would be in shape when the next flood came; when we did that the water backed up and that very materially reduced the crest when the second rise came on the 24th of the month."

Mr. Crouch was further asked and answered as follows:

"Q. I am talking about the rise that occurred in the Caney Fork River below Johnson's Ferry, between ten a. m. on the 21st and five a. m. on the 22nd, and I am asking you if that rise was not occasioned chiefly by the release of water through your gates? A. Yes.

"Q. And likewise the rise at Robinson's Island on the 22nd? A. That it was caused from the water passing through the gates at Rock Island?

"Q. Yes sir. The water passing through the gates at Rock Island. Is it not a fact that that was the chief contributing factor? A. Well, that depends on what you mean by contributing factor?

"Q. Is it not a fact that more water contributed to that rise that passed through those gates at Rock Island than came from any other source? A. Probably yes, the high water that passed through the gates contributed to it during that time.

"Q. You think that helped the rise generally? A. Yes sir."

The difference in elevation between the island and the top of the dam at Rock Island is 260 feet. The river flows at places through gorges or narrow ways and the fall of the water in places is rapid.

Mr. L. R. Currey, a graduate engineer with eight years' experience, introduced by the plaintiffs, testified in answer to a very full and fairly accurate hypothetical question, that under the circumstances existing at Rock Island, with six flood gates left open for a period of nine hours, about forty per cent more water would go through the flood gates than would go over them during said period. He was asked and answered as follows:

"Q. Now Mr. Currey I will ask you to assume that at a given time the maximum stream flow into the reservoir at the dam at Rock Island was reached, and assume also at that same time six flood gates were opened and that the discharge at that time equaled the maximum inflow at that given time; that eighteen hours later the maximum effect of the opening of these six gates and releasing the maximum stream flow from the dam, which was equal to a maximum inflow, reached a stage in the river at a certain point in the river and had caused a stage in the river of nineteen and four-tenths feet, and then assume that the point of the maximum inflow was passed, and then assume that the discharge for an hour after that time exceeded by a small amount the inflow and that for a period of ten hours the reservoir was reduced one and six-tenths feet below the top of the dam, would that effect the maximum crest at that given point down the river nineteen and four-tenths feet, provided the maximum outflow never exceeded the maximum inflow? A. Yes, sir.

"Q. It would? A. Yes sir.

"Q. You think that although the level of the pool is reduced one and six-tenths feet during that period of ten hours? A. Yes, that is to be added to the flow of the water coming in; that would be added to the increase after that, after the maximum is past."

Again Mr. Currey was asked and answered:

"Q. Now, Mr. Currey, if the level of the pool was reduced one and six-tenths feet during the period spoken of, nine hours, it would have first caused a larger volume of water to go down the stream than would have gone if the gates had not been opened? A. Yes sir, it would.

"Q. You mean that the highest crest which reached a given point would have been reached had the gates not been opened? A. Yes sir.

"Q. Now, that don't assume that the inflow had never exceeded the outflow, if that was true why then there would have been no increase? A. That is true.

"Q. Well, that was the portion of your testimony that I did not understand, how you could reduce the level of the pool if the outflow and the inflow was the same? A. If the pool level was constantly retained at the same elevation it would not materially affect the crest after it got down below; there would not be any question about the stage of the river, if the water had gone down prior to the time or at the time that the water had left up there; whether it was rising or falling is not the question, if the water had got down below there and it was falling then the crest would not have affected by reason of the water passing over or through the gates.

"Q. In other words, when the water got down to a given point in the river, it would be lower than the water reached there flowing over the gates than it would be when the water reached there passing through the gates? A. Flowing through the gates, yes sir.

"Q. In other words, it would affect the crest very materially, the crest of the water at a given point below if the river was falling? A. Yes sir.

It is not questioned that the whole method of construction of the dam and power plant was and is a standard method, and that when operated reasonably the rights and interests of riparian proprietors would be conserved. It is undisputed that there was an extraordinary volume of water coming down the river to the dam. However, there is material evidence, hereinbefore set forth, tending to show that storing up and holding back such an enormous body of water and then suddenly releasing it in enormous quantities under very heavy pressure, caused or very materially contributed to the inundation of the island and the destruction of the crop. There is material evidence that the outflow did exceed the inflow and this being true, the natural flow of the water was necessarily changed or interfered with. A duty which the Company owed to the plaintiffs was therefore violated. Even if the sudden release of the water in such enormous quantities was not the sole cause of inundation, the evidence tends to show that it was one of the efficient contributing causes thereof. In other words, a reasonable mind might infer from the evidence that although the first rise was high and was caused by natural drainage from rains, the release of the water through the dam added to this rise sufficiently to cover the island. The rule is that negligence in order to render a person liable, need not be the sole cause of an injury; that while mere concurrence of one's negligence with the proximate and efficient cause of the dis-

aster will not create liability, one is liable, if his negligence concurred with that of another, or with an act of God, or with an inanimate cause and became a part of a direct and proximate cause, although not a sole cause. 22 R. C. L., 128; Beopple v. Railroad, 104 Tenn., 420, 58 S. W., 231; Coleman v. Bennett, 111 Tenn., 712, 69 S W., 734; Turnpike Co. v. English, 139 Tenn., 638, 202 S. W., 925.

It results therefore that this court is unable to sustain the assignments of error and they are overruled and the judgment of the circuit court is affirmed. A judgment will be entered in this court in favor of the plaintiffs against the Tennessee Electric Power Company for the sum of $275, with interest from date of the judgment in the circuit court, and all costs of the cause; the costs of the appeal will also be adjudged against the plaintiff in error and the sureties on the appeal bond.

Faw, P. J., and Crownover, J., concur.

(Published by direction of the Court because of the importance of the issues of fact to the public. As to the rule in the first headnote, see chapter 94, of the Public Acts of 1929.)